# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | | |
|---|---|---|
| Nicholle L. Grisanzio | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CV 50197 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Starting when she was a young girl and continuing into her adult life, plaintiff Nicholle Grisanzio has periodically suffered from headaches, balance problems, numbness, and loss of vision. Although a few doctors speculated about the cause of these problems, it was only many years later until plaintiff finally learned that they were likely caused by an uncommon neurological disorder known as Chiari malformation.[2]

Sometime around early 2010, plaintiff's symptoms worsened. One critical date for purposes of this case is January 16, 2010. This is when plaintiff went the emergency room complaining about a severe headache, nausea, and vision problems. She told doctors then that she was having bad headaches at the frequency of once a month. In 2011 and 2012, plaintiff worked part-time as a school cafeteria worker, making only a couple thousand dollars each year, and eventually had to quit because the job became too taxing with her deteriorating condition. In May 2012, she had the first of three surgeries to address the continuing problems caused by the

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] *See* Mayo Clinic website ("Chiari malformation [] is a condition in which brain tissue extends into your spinal canal. It occurs when part of your skull is abnormally small or misshapen, pressing your brain and forcing it downward. Chiari malformation is uncommon, but increased use of imaging tests have led to more frequent diagnoses.").

1

Chiari malformation. Although these surgeries provided some temporary relief, the symptoms returned and worsened. There is no dispute that, by sometime around January 2013, plaintiff's condition had reached the point where she would qualify as disabled based on, among other things, having headaches at the frequency of once a week. R. 17. However, because plaintiff's claim was based on Title II, she had to prove that she was disabled by the date last insured ("DLI") of June 30, 2010.

On October 23, 2014, a hearing was held before an administrative law judge ("ALJ"). The ALJ made clear at the outset that the critical issue was timing—namely, whether plaintiff was disabled by the DLI (*i.e.* over four years earlier). There were only two witnesses, plaintiff and the impartial medical expert.

Plaintiff, who was then 39 years old, testified that she currently had trouble getting through the day and had to significantly limit her activities, for example showering only twice a week and then using a shower chair. R. 49. As for her condition in 2010, plaintiff testified that she had episodes where she would have a headache and her body would go numb, like she was "having mini-strokes," and that these were once a month and more if it rained. R. 50. She would then have to "go to bed, get to ice, get medical treatment," and it would last "up to three days." R. 51. She also had loss of vision with the headaches.

Dr. Semerdjian focused his analysis on whether plaintiff's headaches in 2010 were occurring at the frequency of once a week, which he stated was the primary requirement for meeting Listing 11.03. He concluded that they were not, and this conclusion was based largely on the one visit to the emergency room on January 16, 2010 when plaintiff told doctors that her severe headaches were then about once a month. Dr. Semerdjian's testimony emphasized that plaintiff had little treatment in the period leading up to the DLI. He noted, for example, that there

was no treatment in 2011 and the record "jumps into 2012." R. 56. However, he did agree that plaintiff had Chiari malformation as of the DLI and that, as of January 2013, her weekly headaches likely were frequent enough to meet the listing. R. 62.

On December 15, 2014, the ALJ found that, although plaintiff's Chiari malformation was a medically determinable impairment, it was not *severe* impairment as of June 30, 2010. Therefore, plaintiff's case failed at Step Two. By deciding the case at this early stage, the ALJ did not go on to conduct a residual functional analysis ("RFC") at Steps Four and Five. The ALJ's conclusion largely tracked the reasoning of Dr. Semerdjian—namely, she relied heavily on the January 2010 visit to the emergency room and more generally on the lack of treatment. R. 18.

## DISCUSSION

Plaintiff has two primary arguments for remand. The first is that the ALJ prematurely decided the case at Step Two. The second is that the record was incomplete. The Court finds that a remand is justified based on the first argument.

This argument is relatively straightforward. At Step Two, the ALJ must determine whether a claimant has one or more severe impairments. Somewhat contrary to the common connotation of the word "severe," in Social Security disability litigation at Step 2, the word has a more diluted meaning. As the Seventh Circuit has stated, the inquiry at Step Two is meant to be only "a *de minimis* screening for groundless claims." *See Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016); *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) ("The Step 2 determination is 'a *de minimis* screening for groundless claims' intended to exclude *slight*

*abnormalities* that only *minimally impact* a claimant's basic activities.") (emphasis added).[3] For example, in *Meuser*, the Seventh Circuit remanded the case because the ALJ, in considering whether schizophrenia was a severe impairment, applied a too-demanding standard at Step 2 by "conflat[ing] Steps 2, 4, and 5." 838 F.3d at 910.

The same basic problem exists here. In finding that plaintiff's Chiari malformation was not a severe impairment, the ALJ engaged in the type of extended and critical analysis that is typically done in the later RFC analysis at Steps Four and Five. Here, there was both objective evidence (*e.g.* MRI scans from 2010), as well as subjective testimony that plaintiff was being affected by her Chiari malformation in ways that were more than *de minimis*. The ALJ did not dispute that plaintiff's condition in 2010 caused severe headaches at least monthly, ones sometimes requiring her to stay in bed for three days to recover. Insofar as this Court can tell, none of plaintiff's many treating doctors ever questioned the credibility of her self-reports about her problems. Based on this Court's experience in reviewing disability cases, this Court finds that the evidence was sufficient to meet the relatively lax standard of not being a "groundless claim."

But there is an additional, more concrete reason why the ALJ's Step Two analysis is insufficient. The ALJ relied on the opinions of both the State agency physician (Dr. Panepinto) and the testifying expert (Dr. Semerdjian) who, according to the ALJ, agreed with her Step Two determination. However, as plaintiff persuasively argues, both assertions are questionable at best. As for Dr. Panepinto's opinion (Ex. 4A), plaintiff argues in her opening brief that this opinion rested on "fundamental factual error"—namely, that plaintiff's treating physician opined that she was able to work in 2010 without restrictions. Dkt. #14 at 10. The Court need not sort through

---

[3] This is not to say that Step 2 is a toothless tiger. Claims can be denied at Step 2 and upheld on appeal. *See, e.g., Cross v. Colvin,* 14 CV 50154, 2016 U.S. Dist. LEXIS 32022, *7 n. 2 (N.D. Ill. Mar. 14, 2016) ("But step two denials—and affirmances of those denials—are not unicorns.").

the details regarding this allegation because, to its credit, the Government agrees that the doctor made a mistake. Dkt. #21 at 4. The Government argues that this problem is not significant because Dr. Semerdjian's testimony provides independent support for the ALJ's finding.

But throwing all the eggs into Dr. Semerdjian's basket is not a solution. His testimony never squarely addressed the Step Two question, but instead leapfrogged to the Step Three question. The doctor's testimony is lengthy, with the typical twists and turns of live testimony, but the Court cannot find any instance where he clearly answered the basic question of whether plaintiff's Chiari malformation was a severe impairment as of June 30, 2010. The question was raised several times, but each time the testimony veered into another direction. *See* R. 60, 61. The hearing focused instead on the narrow question of whether plaintiff's headaches were frequent enough, in 2010, to meet the listing requirements. However, the ALJ decided the case at Step Two, which meant that the ALJ essentially repackaged Dr. Semerdjian's Step Three testimony back into the Step Two analysis.[4]

One might argue that this was merely a procedural error and that the analysis at these two steps is roughly the same. But such an argument glosses over the divergent purposes of these steps. Despite their numerical contiguity, these two steps are conceptually poles apart. The Supreme Court explained this difference as follows:

> The severity regulation [*i.e.* the Step Two determination] increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are *so slight* that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account. Similarly, step three streamlines the decision process by identifying those claimants whose medical impairments are *so severe* that it is likely they would be found disabled regardless of their vocational background.

---

[4] In the decision, the ALJ gingerly skipped around this discrepancy by stating the following: "*Essentially* Dr. Semerdjian opined that prior to the date last insured, the record does not reflect a severe impairment." R. 19 (emphasis added). As noted above, in this Court's view, his testimony is at best ambiguous on this point.

5

*Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (emphasis added). As evidenced by the "so slight/so severe" framework, these two steps essentially set forth the outer ranges of the disability continuum. By conflating these steps, the ALJ applied a much stricter burden than was required at Step Two. The net effect is that the ALJ did not conduct an RFC analysis, where she would have had to look beyond the mere question of headache frequency and consider the totality of plaintiff's limitations. By prematurely deciding the case at Step Two, the ALJ denied plaintiff this alternative route to being found disabled. For this reason, a remand is warranted.

Having concluded that a remand is warranted, this Court need not resolve plaintiff's second argument. However, for the sake of completeness, the Court will briefly summarize these arguments and offer a few observations. Plaintiff argues that the ALJ failed to develop the record in various ways, thus conveying a distorted picture about how long she suffered from headaches and how much treatment she received. At issue are three specific pieces of evidence: (i) three pages of hospital records from a February 7, 2005 emergency room visit where doctors stated, based on a CT scan, that plaintiff had a possible Chiari I malformation (Ex. 14F); (ii) a one-page exhibit documenting an emergency room visit in 1995 when plaintiff was 20 years old and complained about a severe headaches causing her to black out, have blurred vision, and vomit (Ex. 13F); and (iii) eleven pages of records, from early 2010 until early 2011, documenting treatment with neurologist Dr. Faisal Raja (Ex. 15F).

The first two exhibits (13F and 14F) are arguably relevant in bolstering plaintiff's general claim that her problem with headaches was long-standing, but these two exhibits do not strike the Court as being a significant part of that argument. Put differently, the Court would not have remanded based solely on this argument. Although these two exhibits were submitted after the

6

hearing, they were still considered by the ALJ in the decision.[5] As plaintiff concedes, they addressed her condition "well before" the DLI—one was five years earlier and the other fifteen. Dkt. #14 at 13. Although Dr. Semerdjian did not see the four pages from these two exhibits, he was aware of plaintiff's general argument that she had complained about headaches for many years. This fact was mentioned in other medical statements and was also emphasized by plaintiff's counsel at the hearing. Also, plaintiff's theory of the case is that she had a "slowly" progressing disorder (Dkt. #22 at 1) that "began to deteriorate in 2010" (Dkt. #14 at 3), which implies that her condition in 1995 and 2005 may not have yet crossed the threshold for being found disabled. It is true that Dr. Semerdjian did not view these two exhibits, but based on the above arguments, it is unlikely that they would have altered his basic analysis.

However, the records of plaintiff's treatment with Dr. Raja present a stronger claim for relevance. They document treatment during the critical period just before and after the DLI. They provide some rebuttal to Dr. Semerdjian's and the ALJ's complaint that the record "jumps into 2012" after the January 2010 emergency room visit. They show that plaintiff had four injections to address ongoing pain, thus countering the ALJ's lack of treatment rationale. Dr. Raja was also a neurologist, and other doctors deferred to his opinion about Chiari malformation. These records contain other statements helpful to plaintiff's case, such as the fact that she stated on February 5, 2010 that "every couple of weeks her headache[s] get worse." R. 729. Even the Government has conceded that these records are material. Dkt. #21 at 6. But the argument for remand is complicated by the fact that, for some unknown reason, they were only submitted for

---

[5] An argument could be made that they were only considered as an after-thought based on the fact that they were awkwardly included out of chronological order and based on several earlier statements by the ALJ suggesting that plaintiff's problems only emerged in 2010. *See, e.g.* R. 15 ("The earliest medical evidence related to her allegedly disabling impairment is the January 16, 2010 ER report from Swedish American Hospital.").

7

the first time to the Appeals Council.[6] Accordingly, to order a remand based on this argument, the Court would have to (among other things) decipher an ambiguous Appeals Council order. *See generally Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012) (summarizing the various issues raised by this type of argument). Fortunately, this Court need not resolve these questions because it has already found that a remand is warranted. Therefore, all this evidence may be considered on remand, thus ensuring that the ALJ and medical expert decide the case based on a complete record.

As a final observation, which relates to the above arguments, the Court notes that the ALJ, in general, gave much less attention to a fairly large body of evidence about plaintiff's treatment in 2012 and later. During this period, plaintiff saw a number of doctors, some of whom were specialists (including Dr. Alexander, Dr. Sweet, Dr. Ross, Dr. Iskandar, Dr. Dahlberg, Dr. Brooks) and had multiple surgeries and many doctor visits. It is true that this is treatment after the DLI. However, these doctors made some statements relevant to the plaintiff's pre-DLI condition. *See, e.g.*, R. 599 (Dr. Iskandar noting in February 2013 that plaintiff's 2010 MRI "revealed an *obvious* Chiari malformation, with tonsillar descent of about 8 mm with distortion of the tips of the tonsils and concomitant downward herniation of the medulla consistent with a Chiari 1.5") (emphasis added). In addition, as plaintiff notes in her reply brief, SSR 83-20 states that, in cases of progressively worsening disorders where there is little medical evidence at the time of onset date, "it will be necessary to infer the onset date from the medical and other

---

[6] At the same time, there were a number of references in the existing record indicating that plaintiff received treatment from Dr. Raja. *See, e.g.* R. 302 (Sept. 8, 2010 emergency room report stating that plaintiff "has a history of Chiari malformation that is *being followed by Dr. Raja*") (emphasis added); R. 370 (May 5, 2012 record from Dr. Alexander: "She has had injections by a neurologist which she says did help the pain somewhat but she feels that she is getting worse.").

8

evidence."[7] This regulation states that a medical expert should be called to help with this inferential process and gives the example of a reviewing physician concluding, based on the "current severity of the claimant's circulatory condition," that it "was reasonable to expect" that he would have had various lifting limitations a year or so earlier. In this case, there was evidence that could be used to conduct a similar backwards-looking analysis. In the fall 2014, Dr. Ross, plaintiff's primary care physician, completed two questionnaires stating, among other things, that plaintiff was then "<u>completely</u> <u>disabled</u> due to pain." R. 716 (emphasis in original). Going back over a year earlier to January 2013, Dr. Semerdjian agreed that plaintiff's headaches were likely then frequent enough to qualify as disabled under Listing 11.03. Even earlier, in May 2012, plaintiff had a significant brain surgery to correct problems from the Chiari malformation. Although the record is not entirely clear, the mere fact that she was undergoing this type of surgery would suggest that her symptoms were fairly serious by then. There is other evidence suggesting that plaintiff's condition was slowly worsening over this general period. The ALJ's analysis, in contrast, presupposes a more dramatic downturn leading up to—or, possibly, even after—the first surgery. *See, e.g.* R. 17 ("Only *following* the surgery for the chiari malformation on May 2, 2012, are headaches documented more frequently.") (emphasis added). The ALJ and Dr. Semerdjian mentioned some of this evidence, but did not give it any sustained attention nor consider this type of analysis. The ALJ and expert should do so on remand, and also should conduct an RFC analysis.

---

[7] *See also Bjornson v. Astrue*, 671 F.3d 640, 642 (7th Cir. 2012); *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of claimant's condition during that period.").

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: December 18, 2017      By: _____
                                 Iain D. Johnston
                                 United States Magistrate Judge